AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>CURTIS FULLWOOD<br><br>*Defendant(s)* | )<br>)<br>) Case No. 13-8249-DLB<br>)<br>)<br>) |

FILED by _____ D.C.
MAY 15 2013
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __4/16/2013__ in the county of __Broward__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| The Health Insurance Portability and Accountability Act of 1996, Title 42, United States Code, Section 1320d–6(a)(3) and (b)(3) | Wrongful disclosure of individually identifiable health information with intent to sell, transfer, and use for personal gain |

This criminal complaint is based on these facts:
see attached affidavit

☑ Continued on the attached sheet.

_____
Complainant's signature

Special Agent Michael Degnan
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5-15-2013

_____
Judge's signature

City and state: West Palm Beach, Florida      Dave Lee Brannon, U.S. Magistrate Judge
*Printed name and title*

**Affidavit in Support of a Complaint and a Search Warrant**

I, Special Agent Michael Degnan, being duly sworn, depose and state as follows:

1) I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") for twenty-one years. I have been personally involved in the investigation of this matter. I am fully aware of the facts and circumstances set forth below based on recordings I have reviewed and conversations I have had with others, including other law enforcement agents. Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not attempted to include all the facts I learned in connection with this investigation. Where I have reported the contents of documents or the actions or statements of others, I have reported those matters in substance and in part, except as otherwise indicated.

2) I submit this affidavit in support of applications for (1) a complaint charging Curtis Fullwood with wrongful disclosure of individually identifiable health information with intent to sell, transfer, and use for personal gain, in violation of the Health Insurance Portability and Accountability Act of 1996, Title 42, United States Code, Section 1320d–6(a)(3) and (b)(3) and (2) a warrant to search an HP Compaq computer formerly used by Curtis Fullwood, an employee of South Florida State Hospital, located at 800 East Cypress Drive, Pembroke Pines, Florida, in the course of his duties there. The computer is now in the custody of the FBI

3) In or about April 2013, I initiated an investigation of an individual named Terri Davis based on information I received from a confidential informant (CI) regarding Davis's participation in criminal activity. In particular, the CI stated that Davis wanted to meet with the CI in order to provide the CI a list of names to file fraudulent tax returns with the Internal Revenue Service (IRS). The investigation and subsequent arrest of Davis led me to initiate an investigation of Curtis Fullwood.

4) In or about April 2013, the CI reported that Davis utilizes the following two telephone numbers: 786-209-6995 and 786-431-9816.

5) On April 2, 2013, the CI contacted Davis at telephone number 786-209-6995. This call was recorded by the FBI. During the call, the CI and Davis agreed to meet the following day and that Davis would bring something with him when they met. The CI and Davis then spoke about the number of items Davis would bring with him when they met the following day. The CI suggested two hundred and Davis responded, "let me call him".

6) On April 3, 2013, the CI met with Davis in the CI's vehicle which was parked in a shopping complex parking lot located at Stirling Road and University Drive in Broward County, Florida. A concealed audio/video recording device was used to record this meeting.

7) During the meeting on April 3, 2013, Davis handed the CI an envelope with the following handwritten on the exterior of the envelope "433 + 4 (underline) 437". After Davis handed the envelope to the CI, the CI asked how many were in there. In response Davis said "437".

8) After providing the envelope to the CI, Davis told the CI to "bring me back some mother fucking money". In response, the CI told Davis, "you know it's been going crazy right?...the IRS ain't releasing stuff but I believe it might change, but we throw em' in same as before...and we only could do it low, we can't do it no high". In response Davis asked, "how high you going?" and the CI responded "two grand".

9) During the meeting on April 3, 2013, the CI asked Davis if the information in the envelope was coming from "the dude in the hospital thing". In response Davis said, "yeah...and he gonna get some more today".

10) After the meeting between the CI and Davis concluded, the CI provided the envelope that had been given to the CI by Davis during their meeting to the FBI. Within the envelope were numerous typewritten documents which contained the following headings: Person Served, SSN, Date of Birth, Date of Admission, Date Discharged, and Admission Unit. Beneath these headings on each page were numerous names, social security numbers, and dates of birth. A query was conducted of several

2

of these names through the Florida Driver and Vehicle Information Database (DAVID) which found the personal identifying information (PII) indicated on the documents in the envelope matched the PII in DAVID.

11) Amongst the documents Davis provided to the CI on April 3, 2013, five of the pages contained the words/date "Printed 9/26/2012" and "Admissions" at the bottom of the page.

12) Through a public source query of the information contained in the documents the CI received from Davis on April 3, 2013, I determined that this information possibly originated from a company named GEO Care LLC.

13) GEO Care is a company which operates State psychiatric hospitals and provides mental health services to its patients. South Florida State Hospital, located in Pembroke Pines, Florida, is one of the psychiatric hospitals operated by GEO Care.

14) Curtis Fullwood has been employed by South Florida State Hospital for more than twelve years. Fullwood's current responsibilities include assisting psychiatric patients at South Florida State Hospital to obtain jobs within the hospital.

15) On April 15, 2013, at approximately 4:25pm, the CI contacted Davis at telephone number 786-209-6995. This call was recorded by the FBI. During the call, the CI told Davis that some IRS refunds had been received for the names Davis previously gave to the CI and that the CI had $3,000 for Davis.

16) On April 15, 2013, at approximately 6:12pm, the CI contacted Davis at telephone number 786-209-6995. This call was recorded by the FBI. During this call, the CI and Davis agreed to meet the following day so that the CI could pay Davis and receive any additional names that Davis wanted to give to the CI. Davis stated that his contact went out of town but should be back and that Davis was going to call him. The CI asked Davis to request a list pertaining to younger people and the CI would file them because it seemed like the IRS accepted those quicker than others. Towards the end of the

call, the CI asked Davis to call the CI in the morning and let the CI know everything was good. In response, Davis said, I'm going to call him now. This call ended at 6:17pm.

17) On April 15, 2013, $3,000 was obtained in evidence purchase funds from the FBI and each of the bills was photocopied.

18) On April 16, 2013, the evidence purchase funds were given to the CI to utilize in a pre-arranged meeting with Davis.

19) On April 16, 2013, the CI met with Davis in CI's vehicle which was parked at a shopping complex parking lot located at Stirling Road and University Drive in Broward County, Florida. During this meeting, Davis gave the CI two sets of stapled documents which contained information to include names, SSNs, dates of birth, and dates of admission. The first set of stapled documents was six pages and contained the words/number "Total Admitted: 258" on the last page. The second set of stapled documents was seven pages and contained the words/number "Total Admitted: 284" on the last page. Each page in both stapled sets of documents contained the words/numbers "Printed 4/16/2013" and "Admissions" at the bottom of the page.

20) During the meeting on April 16, 2013, the CI also paid Davis $3,000 purportedly for income tax refunds which were received utilizing some of the names on the lists Davis provided to the CI on April 3, 2013.

21) Following these transactions, Davis was detained by FBI Agents in the parking lot of the shopping complex where he met with the CI. Davis was found to be in possession of $3,000 in currency. The serial numbers on these bills were compared to the serial numbers on the photocopies of the evidence purchase funds previously provided to the CI and were found to be identical.

22) Davis was arrested shortly afterwards. In a search incident to the arrest, Davis was found to be in possession of two cellular phones. The FBI retained custody of these phones and obtained a search warrant for their contents on April 19, 2013. The search warrant was executed on April 23, 2013.

23) Following the arrest of Davis, I contacted representatives of GEO Care to confirm the lists given to the CI by Davis on April 3, 2013 and April 16, 2013 originated at their company and to determine the identity of the person who generated these lists.

24) Representatives of Geo Care advised me that the lists are known as Admissions Reports and pertain to past and present patients of South Florida State Hospital.

25) As stated above, some of the pages of information the CI received from Davis on April 3, 2013 contained information indicating they had been printed on September 26, 2012. JR, the individual responsible for oversight of software applications and data administrators at GEO Care conducted a query of the computer system at South Florida State Hospital for any employees that ran an Admissions Report on September 26, 2012. JR determined that three employees ran Admissions Reports on that date, including Curtis Fullwood.

26) As stated above, the pages of information the CI received from Davis on April 16, 2013 contained information indicating they had been printed that same day, April 16, 2013. JR conducted a query of the computer system at South Florida State Hospital for employees that ran Admissions Reports on April 16, 2013. JR determined that three employees ran Admissions Reports on this date before Davis met with the CI. One of those employees was Curtis Fullwood.

27) Based on the computer system queries conducted by JR, the only employee found to have run Admissions Reports on both September 26, 2012 and April 16, 2013 was Curtis Fullwood.

28) On May 3, 2013, Curtis Fullwood was interviewed at the South Florida State Hospital by myself and another FBI Agent. During the interview, Fullwood stated that Terri Davis is his cousin. Fullwood denied ever giving Davis any lists of patient names from South Florida State Hospital. Fullwood acknowledged that if he had given Davis such lists it would be a violation of HIPAA laws.

29) During the interview of Curtis Fullwood, on May 3, 2013, Fullwood stated that his personal cell phone number is 954-790-4339. Using a law enforcement database, an FBI analyst determined that Fullwood's cell phone number is 954-740-4339 (a difference of one digit).

30) As previously described, in a recorded telephone call between the CI and Davis which ended at 6:17pm on April 15, 2013, Davis and the CI spoke about getting more names from Davis's contact. As this call concluded, Davis stated I'm going to call him now. Based on the search warrant executed on a cell phone in Davis's possession at the time of his arrest, an outgoing call was placed to a contact known as "Curtis" at 954-740-4339 on April 15, 2013, at 6:17pm.

31) Based on the query conducted by JR of the computer system at South Florida State Hospital, Curtis Fullwood ran Admissions Reports at 9:53am and 9:57am on April 16, 2013.

32) Based on a search warrant executed on a cell phone in Davis's possession at the time of his arrest, outgoing calls were placed to contact "Curtis" at telephone number 954-740-4339 on April 16, 2013 at the following times and with the following durations:

| | |
|---|---|
| 9:48:39am | 7 minutes 45 seconds |
| 10:34:05am | 1 minute 36 seconds |
| 10:42:55am | 1 minute 51 seconds |
| 10:48:01am | 0 minutes 20 seconds |

33) On May 3, 2013, the Assistant Hospital Administrator at South Florida State Hospital voluntarily provided me the computer utilized by Curtis Fullwood at the hospital until that date. This computer is accurately described as a HP Compaq desktop computer, serial number 2UA2131W1D. It is now in FBI custody in Miami-Dade County. In conjunction with providing this computer to me, the Assistant Hospital Administrator signed an FBI Consent to Search form regarding this computer.

34) Assistant United States Attorney Marc Osborne has provided the following legal authority to me. Pursuant to the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d–

6(a)(3) and (b)(3), a person commits a felony who ""knowingly . . . discloses individually identifiable health information to another person . . . if the information is maintained by a covered entity[,] . . . the individual . . . disclosed such information without authorization [and] the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm . . . ."

35) "Individually identifiable health information" includes information "received by a health care provider" that "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual and [] that identifies the individual . . . ." 45 C.F.R. § 160.103. Individually identifiable health information includes patient names, dates of birth, and Social Security numbers. *United States v. Hall*, 704 F.3d 1317, 1318 (11th Cir. 2013).

36) A "covered entity" " includes "[a] health care provider who transmits any health information in electronic form in connection with a transaction covered by" HIPAA regulations. 45 C.F.R. § 160.103. Among other things, HIPAA regulations cover "health care claims or equivalent encounter information transactions." 45 C.F.R. § 162.1101. This type of transaction is either "[a] request to obtain payment, and the necessary accompanying information from a health care provider to a health plan, for health care[,]" or, where a provider is reimbursed for treating a patient in a manner other than fee-for-service, "the transmission of encounter information for the purpose of reporting health care." 45 C.F.R. § 162.1101(b).

37) On May 10, 2013 and May 15, 2013, AUSA Osborne and I spoke to FS, an administrator at South Florida State Hospital. FS told us that most of the hospital's patients are involuntarily admitted by the Florida Department of Children and Families (DCF), which pays a flat daily rate for their treatment, and that the hospital regularly electronically submits encounter information to DCF. For those patients who are eligible, the hospital electronically submits claims to Medicaid for the patients'

room and board. Medicaid pays these claims to DCF. In addition, for those patients who are eligible, the hospital electronically submits claims to Medicare Part B for all laboratory tests performed. Medicaid and Medicare pays DCF for these claims.

38) Based on knowledge and training and the experience of other agents with whom the Undersigned has discussed this investigation, the Undersigned knows that in order to completely and accurately retrieve data maintained in computer hardware or on computer software, to ensure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that some computer equipment, peripherals, related instructions in the form of manuals and notes, as well as the software utilized to operate such a computer, be seized and subsequently processed by a qualified computer specialist in a laboratory setting. This is true because of the following:

a. The volume of the evidence. Computer storage devices (such as hard disks, diskettes, tapes, laser disks, etc.) can store the equivalent of thousands of pages of information. Additionally a user may seek to conceal criminal evidence by storing it in random order with deceptive file names. Searching authorities are required to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data analysis on-site.

b. Technical Requirements. Searching computer systems for criminal evidence can be a highly technical process that can require expert skills and a properly controlled environment. It is often difficult to determine the hardware and software used on a system to be searched before the search is executed, and the vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. As a result, it is difficult to know prior to a search: (1) whether a specific expert or search protocol may be required; (2) if so, which expert may be qualified to analyze the system and its data; and (3) whether and what type of controlled

8

environment may be required. Data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden", erased, compressed, password-protected, or encrypted files. Because computer evidence can be vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis. Further, such searches often require the seizure of most or all of a computer system's input/output peripheral devices, related software, documentation, and data security/devices (including passwords) so that, if necessary, a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.

39) Due to the volume of the data at issue and the technical requirements set forth above, it may be necessary that the above referenced equipment, software, data, and related instruction be seized and subsequently processed by a qualified computer specialist in a laboratory setting. Under appropriate circumstances, some types of computer equipment can be more readily analyzed and pertinent data seized on-site, thus eliminating the need for its removal from the premises. In some cases, a particular device can be more readily, quickly, and thus, less intrusively, analyzed off site, with due considerations given to preserving the integrity of the evidence. This, in turn, is often dependent upon the amount of data and the number of discrete files or file areas that must be analyzed, and this is frequently dependent upon the particular type of computer hardware involved.

40) Based on knowledge, training, and the experience of other law enforcement personnel with whom the undersigned has spoken, the undersigned is aware that searches and seizures of evidence from computers taken from the premises commonly require agents to seize most or all of a computer system's input/output peripheral devices, in order for a qualified computer expert to accurately retrieve the system's data in a laboratory or other controlled environment. Therefore, in those instances where computers are removed from the premises, in order to fully retrieve data from a computer system, investigators must seize all the magnetic storage devices as well as the central

9

processing units (CPUs) and applicable keyboards and monitors which are an integral part of the processing unit. If, after it becomes apparent that these items are no longer necessary to retrieve and preserve the data evidence, such materials and/or equipment will be returned within a reasonable time.

41)   The analysis of electronically stored data, whether performed on-site or in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but are not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer capable of containing pertinent files, in order to locate evidence and instrumentalities authorized for seizure by the warrant); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

Wherefore, there is probable cause to believe that Curtis Fullwood has violated the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d–6(a)(3) and (b)(3) and that the items described in the Attachment are evidence of that crime, items illegally possessed, and property designed for use, intended for use, and used in committing that crime; and that those item will be found during a search of the computer identified on the proposed search warrant.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Michael Degnan
Special Agent, FBI

Sworn to and Subscribed before me this __15th__ day of May 2013.

_____
Dave Lee Brannon
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 13-8249-OLB

UNITED STATES OF AMERICA

vs.

CURTIS FULLWOOD,

Defendant.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003?  _____ Yes __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?  _____ Yes __X__ No

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY: /s/ Marc Osborne
Marc Osborne
Assistant United States Attorney
Court ID# A5500796
500 S. Australian Avenue, Suite 400
West Palm Beach, Florida 33401
Tel: (561) 209-1014
marc.osborne@usdoj.gov